■ GILMAN PAPER COMPANY, Appellant, v SONDRA G. GILMAN, Individually and as Executrix of CHARLES GILMAN, JR., Deceased, et al., Respondents. In the Matter of the Estate of CHARLES GILMAN, Deceased. SYLVIA P. GILMAN, Appellant. GILMAN PAPER COMPANY et al., Appellants, v JULIAN S. BUSH, as Guardian ad Litem et al., Respondents.

The facts relating to the controversies here before us date back to 1967 when Charles Gilman, Sr. (Charles) died. During his lifetime Charles (and his father before him), had been the sole owner of the shares of stock in Gilman Paper Company (Paper). In 1948 he created an inter vivos trust which left control of the corporation in the hands of his sons Howard and Charles, Jr. (Chris), and the corporation's then general counsel, I. Alfred Levy. Corporate control consisted of all the shares of voting stock. The corporation's nonvoting preferred shares were left to Charles' widow, Sylvia, and a charitable foundation, the Gilman Foundation, Inc.

Because of hostility between the two brothers and the inability of Levy to function due to age and illness, the affairs of the corporation deteriorated. As a result, in 1981, a proceeding was commenced before then Surrogate Midonick. During consultation with counsel, Surrogate Midonick indicated that he thought an appropriate solution might be the removal of all trustees. This impelled the parties to negotiate a settlement. Levy resigned as a trustee because of his infirmities. Howard, who, with the assistance of Levy, had downgraded the status of Chris from that of co-chief executive officer to president, agreed to restore Chris to his prior position of equality. As part of the settlement, the nonvoting preferred stock of Sylvia was divided, with her consent, equally between Howard and Chris. Key to the settlement was a provision that if either made a lifetime gift or testamentary disposition of the nonvoting stock to anyone except the other, the Gilman Foundation, or to another charitable corporation, "the other of the two shall have the right to cause Gilman Paper Company to purchase such shares at the fair market value thereof, and shall have the individual right, if the Company does not purchase these shares, to purchase them at the fair market value, exercisable within sixty days". The stipulation provided a method for determining fair market value. It also provided that in the event any dispute arose other than one involving the amounts in excess of $16,000,000 to which the Gilman Foundation might be entitled, the Surrogate "shall be the final arbiter of the problem".

In August 1981, two months after the entry of the formal decree, the Congress enacted the Economic Recovery Tax Act of 1981. It provided for a qualified terminal interest property trust (QTIP) which increased materially the allowable marital deduction effective January 1, 1982. Desiring to take advantage of these provisions, Chris commenced negotiations with Howard for an amendment of the stipulation. When no agreement was reached, Chris' attorneys submitted a proposed modification clause to Surrogate Midonick requesting that, as arbiter, he approve it. A conference was called and the attorneys were afforded an opportunity to review the proposal. Some three weeks later the Surrogate received a letter from Howard's attorney which indicated Howard's willingness to accept Chris' proposal. Although certain changes were suggested, these were referred to as largely semantic and "do not seem to be of importance either way". The letter indicated that Howard was ready to sign. This agreement was confirmed at a conference held four days later.

During the first week in January 1982, Chris entered the hospital, apparently for a checkup. While in the hospital he executed a will containing a QTIP trust and naming Sondra Gilman, his wife, as executrix, and Sondra and James Marcus as cotrustees. Seven days later, he died. Approximately two months thereafter Paper brought a joint Supreme/Surrogate's Courts proceeding against the executrix and the cotrustees, contending that the original stipulation entered was never formally amended and that under the terms of that stipulation it had the right to purchase the shares of nonvoting stock held by Chris' estate. Defendants moved to dismiss the complaint and plaintiff cross-moved for summary judgment. By that time Surrogate Midonick had retired to resume the practice of law and Justice Myers had been designated as Acting Surrogate. The Acting Surrogate noted that the right of Paper to purchase was triggered under two conditions only: by a "lifetime gift" or "testamentary bequest". He indicated that if Sondra, individually and as executrix and trustee, and Marcus, as her cotrustee, renounced the QTIP trust under EPTL 2-1.11, the triggering event would not have transpired. Accordingly, he denied the motion to dismiss, with leave to renew in the event of such renunciation. He allowed her 60 days within which to exercise that right. Plaintiff's motion for summary judgment was denied.

A motion for renewal and reargument was thereafter made by Paper. Protracted negotiations between the parties ensued and the motion was not heard until 10 months thereafter. By that time the appeal to this court was pending. The Acting Surrogate

clarified his decision only to the extent that he extended the time of defendants to renounce until 60 days after final disposition of the appeal to this court.

We agree with these rulings of the Acting Surrogate, both on the original motions and on renewal and reargument. Accordingly, on that proceeding, we affirm.

The second proceeding results from the approval of an application by the guardian ad litem of Chris' two infant children (one of whom has since reached maturity) for an immediate allowance of $200,000 to be paid on account to experts retained by him to appraise the value of his wards' contingent remainder interests in the estate of Charles. That interest is limited to the six shares of voting stock in Paper.

During the negotiations which followed the initial determination of the Acting Surrogate, a tentative agreement was negotiated by Sondra for the sale of stock held by Chris' estate in Paper. That agreement, which is not before us but which involved, presumptively, the interest of Chris in both the voting and nonvoting preferred shares in Paper, required approval inasmuch as it may affect the possible interests of minors. It has not yet been approved. Throughout these negotiations Sondra had the expert advice of the investment firm of Lazard Freres. The papers submitted to the court include its opinion that the proposed settlement, which includes a payment of $19,300,000 and other benefits to Sondra in return for her 911 shares of nonvoting stock in Paper and approximately $3,000,000 to the children in cash, timberlands and other benefits in return for their contingent remainder interest in six shares of the voting stock in Paper, was fair and reasonable. This conclusion was buttressed by appraisals from two nationally known appraisers which valued Paper at between $35-37 million. They concluded that if an attempt were made to sell the company as a going concern that valuation ought be substantially discounted because of the marketability factor.

Notwithstanding this, the guardian ad litem insisted that his own experts be required to value the properties involved to enable him to determine whether the proposed payments to his wards were adequate. Initially, he estimated that this could be done for $25,000. Thereafter, he applied to the court for approval of the experts selected by him and for interim payment to be made to them. He requested and was granted an interim allowance of $200,000 for expert services and directed that the payment be made by Paper. From the record it is fair to assume that the appraisal, when completed, will involve the expenditure of approximately $450,000 to $500,000.

We think the Acting Surrogate's order was improper for two reasons. First, the expert proof submitted amply supported the conclusion that the payment to be made on behalf of the children was fair and reasonable. Lazard Freres had been employed to assist Sondra in reaching a determination on the value of her interests and that of her children in Paper. Inasmuch as the children are the natural objects of her bounty, the assumption is compelling that she exerted every effort to achieve the best results for them. Secondly, it was improper to assess the costs against Paper. The tentative agreement reached imposed upon Sondra the obligation of paying the fees of the guardian ad litem and the expenses incident thereto. Paper, although it is the proposed purchaser of the stock, is only nominally interested in the purchase. The real party in interest is Howard. To saddle Paper with the obligation to pay experts involved in a transaction in which it is only marginally interested is, we think, improper, particularly since, by agreement, Sondra stipulated to assume that obligation. Concur — Ross, J. P., Carro, Asch and Bloom, JJ.